**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

**JEFFERY WILLIAMS,**

       Plaintiff,

v.                                                                    Civil Action No. 7:19-CV-208 (HL)

**WAL-MART ASSOCIATES, INC.,**

       Defendant.

**ORDER**

Plaintiff Jeffery Williams brings this action against his former employer, Defendant Wal-Mart Associates, Inc., alleging that Defendant discriminated against him based on his association with his disabled father in violation of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 1201 <u>et seq.</u>;[1] and interfered with his rights and retaliated against him in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 <u>et seq.</u> Now before the Court is Defendant's Motion for Summary Judgment (Doc. 13). After carefully reviewing the applicable law and the pleadings, briefs, and other evidentiary materials presented, the Court finds no genuine issues of material fact exist as to any claim and **GRANTS** Defendant's Motion (Doc. 13).

---

[1] Plaintiff has abandoned his ADA retaliation claim. (Doc. 15, p. 1 n.1).

## I.     BACKGROUND

Defendant Wal-Mart Associates, Inc. hired Plaintiff Jeffery Williams on November 1, 2016 as a Cap 2 associate at Wal-Mart Store No. 2615 in Valdosta, Georgia. (DSOMF ¶ 1).[2] Cap 2 associates are responsible for unloading freight on both the grocery and general merchandise sides of the store and assist with stocking freight and groceries throughout the store's departments. (Id.). Beginning in 2018, Plaintiff additionally was responsible for breaking down and sorting break pack boxes, which contain an assortment of smaller items that must be organized into bins and boxes for stocking on the appropriate aisles. (Id. at ¶ 2). During his entire term of employment with Defendant, Plaintiff worked the second shift, from 2:00 p.m. until 11:00 p.m. (Id. at ¶ 3).

Plaintiff's direct supervisor was Cap 2 supervisor Kelley Cornwell. (Id. at ¶ 4). Cornwell reported to one of several Assistant Managers, including Roberto Montiel-Sierra and Jennifer Tooley. (Id. at ¶ 5). The Assistant Managers reported to a Co-Manager. (Id. at ¶ 6). The General Merchandise Co-Manager was Christine Guerrero. (Id.).

Throughout Plaintiff's employment, Defendant followed a progressive discipline policy known as the Disciplinary Action Policy. (Id. at ¶ 7). Under the

---

[2] "DSOMF" refers to Defendant's Statement of Undisputed Material Facts. (Doc. 13-2). The cited paragraphs are those admitted by Plaintiff.

policy, after an initial verbal warning any future disciplinary infraction could fall into one of three categories:

<u>Disciplinary Action 1 – Yellow</u>: a first written warning issued after "a verbal conversation . . . about a specific performance and/or conduct issue[ ] and steps have not been taken to remedy it" or where a manager "has determined that circumstances . . . warrant this level of accountability." (Tooley Decl., Ex. 1, p. 2).

<u>Disciplinary Action 2 – Orange</u>: a second written warning issued after receipt of a yellow level warning or where the "manager has determined the circumstances with the job performance or conduct warrant a higher level of accountability." (<u>Id.</u>).

<u>Disciplinary Action 3 – Red</u>: a third written warning issued after receipt of a yellow level warning or where the "manager has determined that the circumstances of the job performance or conduct warrants a higher level of accountability." (<u>Id.</u>).

Any additional performance issues following disciplinary action at the red level may result in termination. (<u>Id.</u> at p. 3). The policy gives discretion to the manager to move to the next progressive step or to determine which level of disciplinary action is appropriate based on the severity of the conduct. (<u>Id.</u>). Some infractions can result in immediate termination. (<u>Id.</u>; Guerrero Dep., p. 18).

Plaintiff consistently struggled to meet his employer's productivity requirements. (Tooley Decl., ¶ 4). Assistant Manager Tooley stated that while Plaintiff was under her supervision, he "often did not complete his assigned tasks before leaving to go home, despite having plenty of time to do so, and he frequently left his assigned work area to go to other areas of the store." (Id.). Plaintiff's direct supervisor Kelley Cornwell also complained to Tooley about Plaintiff's poor productivity. (Id.). When Tooley attempted to discuss these issues with Plaintiff informally, he became argumentative. (Id.). Plaintiff testified that his relationship with Tooley was "strained." (Pl. Dep., p. 21). Plaintiff felt that Tooley nitpicked him and that he could not "get away with anything when it came to her." (Id. at p. 22, 23). He believed he was "put in a position to fail." (Id. at p. 29).

Plaintiff received a written disciplinary action at the yellow level from Assistant Manager Roberto Montiel-Sierra on July 12, 2017 for a productivity issue. (DSOMF ¶ 8). The previous day, Plaintiff was assigned to unload two trucks. (Id.). The task should have been accomplished within four hours. (Id.). Plaintiff began unloading the truck around 2:49 p.m. (Pl. Dep., Ex. 3). However, by the end of Plaintiff's shift at 11:00 p.m., the job remained incomplete. (Id.).

On June 6, 2018, Jennifer Tooley issued Plaintiff a second written disciplinary action at the orange level for poor productivity. (DSOMF ¶ 9). That day, Cap 2 supervisor Kelley Cornwell directed Plaintiff to help in the chemical

4

department after he finished his work in the grocery department. (Pl. Dep., Ex. 2). Cornwell and Tooley instructed Plaintiff and a team of other employees that freight had to be unloaded in the chemical department before going home. (Id.). Plaintiff left before finishing the job. (Id.). Plaintiff disputes Tooley's account of the events. (Pl. Dep., p. 25-26). Plaintiff testified that Tooley required the entire Cap 2 shift to stay past their scheduled time to complete the assignment. (Id. at p. 25). Plaintiff worked until 11:15 p.m. then left. (Id.). According to Plaintiff, he was the only team member disciplined even though he was not the only one who left before finishing the task. (Id.).

Tooley issued Plaintiff a third disciplinary action at the red level for poor productivity on August 27, 2018. (Pl. Dep., Ex. 4). According to the disciplinary report, Plaintiff was instructed after the 2:00 p.m. Cap 2 associate's meeting to break down the remix truck then report to the baker aisle. (Id.). At 7:15 p.m., Tooley rounded through the store to verify that the Cap 2 associates were in their assigned areas. Tooley noted that Plaintiff was not in his assigned area and that he had not finished breaking down the remix truck. (Id.). At 8:20 p.m., Tooley walked through again and still did not see Plaintiff. Tooley did not locate Plaintiff until 8:45 p.m. (Id.).

Tooley requested that Plaintiff meet with her in the personnel department. (Id.). Once in the office, Tooley addressed her concern that Plaintiff had not

finished unloading the truck and that Plaintiff had returned late from his lunch break. (Id.). Plaintiff became argumentative. (Id.). Later in the evening, Tooley discovered Plaintiff talking to other employees rather than working. (Id.). Plaintiff left that night without completing any of his assigned tasks. (Id.). Tooley made the decision to progress to the next level of discipline because, despite previous warnings about his productivity, Plaintiff failed to correct his behavior. (Id.). The disciplinary report warned Plaintiff that if this behavior continued the next level of action would be termination. (Id.). Plaintiff refused to acknowledge the disciplinary action. (Id.). He only recalls discussing the timing of his lunch break with Tooley; he does not remember her mentioning anything about unfinished assignments. (Pl. Dep., p. 30-31).

On July 5, 2018, Plaintiff applied for intermittent leave under the Family Medical Leave Act ("FMLA"). (DSOMF ¶ 13). Plaintiff's father was diagnosed with recurring pancreatic cancer in April 2018. (Id. at ¶ 11). Plaintiff requested leave to assist his mother with his father's care. (Id. at ¶ 12; Pl. Dep., p. 37). Plaintiff's application for intermittent FMLA leave was approved effective July 6, 2018 through July 5, 2019. (DSOMF ¶ 14). For absences related to his father's condition Plaintiff was permitted two episodes per month, with each episode lasting up to four days. (Id. at ¶ 15). He was permitted two episodes per month, with each episode lasting up to three days, for absences related to his father's

treatment. (Id.). Records indicate that Plaintiff formally reported an eight-hour absence on one occasion. (Id. at ¶ 18). However, Assistant Managers Kelly Sims, Roberto Montiel-Sierra, and Jennifer Tooley were aware of Plaintiff's father's diagnosis and informally granted Plaintiff leave to help his father without requiring him to go through the formal reporting process. (Id. at ¶ 20).

Defendant terminated Plaintiff's employment on June 3, 2019 after he again did not complete a job assignment timely. (DSOMF ¶¶ 21, 25). On May 30, 2019, Plaintiff arrived at work at 2:07 p.m. for his 2:00 p.m. shift. Cap 2 supervisor Kelley Cornwell assigned Plaintiff the task of breaking down and sorting the break pack boxes in the back of the store. (Id. at ¶ 22). Plaintiff testified that there was a small truck that day and that there were not many break packs. (Pl. Dep., p. 51).

Sometime after 5:00 p.m., Plaintiff received a telephone call from his mother requesting that Plaintiff drive his father to the emergency room. (DSOMF ¶ 23). Plaintiff informed Cornwell of the situation, who then alerted Co-Manager Christine Guerrero. (Id.). Guerrero authorized Plaintiff to leave but told him to return to his next regular shift with a doctor's note. (Id.). Plaintiff clocked out at 5:28 p.m. (Id. at ¶ 25).

After Plaintiff left, Cornwell "realized the job that [Plaintiff] had done before that was nowhere near where it was supposed to be." (Cornwell Dep., p. 6).

Cornwell reported the problem to Assistant Manager Kelly Sims. (Sims Dep., p. 6; Sims Decl., ¶ 3). Sims confirmed that Plaintiff completed almost none of his assignment and concluded that he had ample time to finish the task in the three and a half hours he worked. (Sims Decl. ¶¶ 3-4). Accordingly, Sims decided to issue Plaintiff a written disciplinary action. (Id. at ¶ 4). After checking the computer system, however, Sims discovered that Plaintiff was already at the "red" disciplinary level and that the next step was termination. (Id.). Because Plaintiff completed almost none of his work for the day, Sims determined that termination was appropriate. (Id.).

Plaintiff returned to work on June 3, 2019. (Pl. Dep., p. 51). Sims met with Plaintiff that day to conduct an exit interview. (DSOMF ¶ 28). Sims advised Plaintiff he was being terminated for insubordination because he did not complete his assigned task of breaking down and sorting the break packs before leaving the store. (Id.).

Plaintiff filed a charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 19, 2019. (Pl. Dep., Ex. 8). Plaintiff alleged in his charge that Defendant discriminated against him in violation of the ADA and FMLA when Defendant terminated him for leaving work to assist his terminally ill father with an emergency. (Id.). The EEOC issued a Dismissal and

Notice of Rights on September 20, 2019. (Pl. Dep., Ex. 9B). This lawsuit followed.

## II.   SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). But, when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In reviewing a motion for summary judgment, the "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000) (citations omitted) "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge." Id. (internal quotation marks and citation omitted). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and to present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. Summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Id. at 323.

## III.    ANALYSIS

### A.    ADA

Plaintiff alleges that Defendant discriminated against him based on his association with his terminally ill father. The ADA protects a "qualified individual" from discrimination on the basis of disability in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines the term "discriminate" to include "excluding or otherwise denying equal jobs or benefits to

a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." Id. § 12112(b)(4). ADA association discrimination claims based on circumstantial rather than direct evidence are analyzed using the familiar burden-shifting framework established in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). See Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004).

To establish a prima facie case of association discrimination under the ADA, the plaintiff must show "(1) that [he] was subjected to an adverse employment action; (2) that [he] was qualified for the job at that time; (3) that [his] employer knew at that time that [he] had a relative with a disability; and (4) that the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative was a determining factor in the employer's decision." Wascura v. City of S. Miami, 257 F.3d 1238, 1242 (11th Cir. 2001) (internal quotation marks omitted). If the plaintiff establishes a prima facie case of discrimination, and the defendant articulates a legitimate, nondiscriminatory reason for the adverse employment action, then the burden shifts back to the plaintiff to demonstrate that the alleged nondiscriminatory reason is a pretext for discrimination. Id. (citing Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000)).

For the purposes of this motion, Defendant concedes that Plaintiff can establish the first and third factors. (Doc. 13-1, p. 6). However, Defendant contests that Plaintiff was qualified for his position at the time of his termination. Defendant also argues that Plaintiff failed to produce evidence sufficient to create a genuine issue of material fact that his father's illness was a determining factor in Defendant's decision to terminate Plaintiff.

Under the ADA, an individual is "qualified" if he, "with or without reasonable accommodation, can perform the essential functions and job requirements of the position the individual holds." Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000) (citing 42 U.S.C. § 12111(8)). Defendant argues that Plaintiff was not qualified as a Cap 2 associate based on Plaintiff's documented history of leaving the job without completing his assignments. In Hilburn v. Murata Elec. N. Am., Inc., the Eleventh Circuit held that an employee is not "qualified" for a position if he fails to meet the employer's neutral attendance policy, even if the absence is to care for a disabled parent. 181 F.3d 1220, 1231 (11th Cir. 1999) (citing Tyndall v. Nat'l Educ. Ctrs., Inc., 31 F.3d 209, 214 (4th Cir. 1994) ("[A]n employer [does not] violate[ ] the ADA by discharging an employee who was frequently absent from work due to her disability and that of a family member.")). Here, however, the evidence demonstrates that Plaintiff struggled with—and was terminated for—a lack productivity not attendance. Defendant has not otherwise shown that

Plaintiff could not fulfill his job duties on the days he had to leave early to care for his father only that he did not. The Court therefore concludes that the facts viewed in the light most favorable to Plaintiff reveal that Plaintiff was qualified to perform the essential functions of his position.

Plaintiff ultimately fails to establish a prima facie case for association discrimination because he has not demonstrated that his father's medical condition was a determining factor in Defendant's decision to terminate him. The undisputed evidence is that Plaintiff's direct supervisors were aware of his father's medical condition and sympathetic to Plaintiff's need to assist with his care. (DSOMF ¶ 20; Tooly Dep., p. 19). His supervisors regularly permitted him to leave his shift early or to take time off from work to attend to his father. (Id.). Even on May 30, 2019, the last shift Plaintiff worked, Defendant did not hesitate to grant Plaintiff permission to leave his shift to transport his father to the emergency room. (DSOMF ¶ 23). After Plaintiff left, however, Kelley Cornwell discovered that Plaintiff completed virtually none of his assigned task during the three and a half hours was present that day. (Cornwell Dep., p. 6). Kelly Sims, the Assistant Manager who made the final decision to terminate Plaintiff, attested that while she knew Plaintiff left his shift early on May 30, she did not know the purpose of Plaintiff's early departure was to take his father to the hospital. (Sims Decl., ¶ 3). She explained that she based her decision to terminate Plaintiff on

his failure to finish an assigned task that could have been completed prior to him leaving that evening. Absent evidence of some discriminatory animus, Plaintiff cannot satisfy the fourth factor of the prima facie case. See Cusick v. Yellowbook, Inc., 607 F. App'x 953, 955 (11th Cir. 2015) (finding that the plaintiff failed to establish a prima facie case of association discrimination because there was no testimony suggesting that the employer "bore any discriminatory animus" against the plaintiff or his ill child).

Even if Plaintiff could establish a prima facie case, he has failed to show that Defendant's legitimate, nondiscriminatory reason for terminating him was a pretext for discrimination. Defendant provides that it terminated Plaintiff for chronic lack of productivity. Prior to terminating Plaintiff, Defendant issued Plaintiff three written disciplinary reports warning him that his continued failure to complete assigned tasks could result in his termination. (DSOMF ¶¶ 8-9; Pl. Dep., Ex. 4). Accordingly, to survive summary judgment, Plaintiff must present sufficient evidence to create a genuine issue of material fact that Defendant's articulated reason was pretext. A plaintiff can show that an employer's articulated reason was false by pointing to "weaknesses, implausiblilities, inconsistencies, incoherencies, or contradictions" in Defendant's explanation. Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997). But "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or

intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996) (quotations and citation omitted). Plaintiff "must meet that reason head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason." Chapman, 229 F.3d at 1030.

Plaintiff has not shown that Defendant's articulated reason for terminating him was false. Instead, Plaintiff questions Defendant's judgment, arguing that Defendant terminated him for not completing a task it was impossible for him to finish because he had to leave early. The inquiry into pretext concerns the employer's beliefs, not the employee's own perception of his performance. Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997), *abrogated on other grounds by* Lewis v. City of Union City, Ga., 918 F.3d 1213 (11th Cir. 2019). The Court does not "sit as a super-personnel department that reexamines an entity's business decisions." Alphin v. Sears, Roebuck & Co., 940 F.2d 1497, 1501 (11th Cir. 1991) (quotation omitted). "An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Chapman, 229 F.3d at 1030. Thus, while Plaintiff may disagree with Defendant's decision, such disagreement, without more, does not create a genuine issue of material fact that

Defendant's reason for terminating Plaintiff was motivated by discriminatory animus based on Plaintiff's association with his disabled father. Defendant therefore is entitled to summary judgment on Plaintiff's ADA association discrimination claim.

## B. FMLA

The FMLA provides that an eligible employee is entitled to take up to twelve workweeks of leave in a twelve-month period to care for a parent with a serious health condition. 29 U.S.C. § 2612(a)(1)(C). An employee may take this leave on an intermittent basis, as Plaintiff did here, meaning "in separate blocks of time due to a single qualifying reason." 29 C.F.R. § 825.202. It is unlawful for an employer to "interfere with, restrain, or deny" the exercise of a right under the FMLA or to discharge or discriminate against an employee who opposes any practice made unlawful under the Act. 29 U.S.C. §§ 2615(a)(1) and (2). An employee may bring two types of claims under the FMLA: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act; and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in an activity protected by the Act." Pereda v. Brookdale Senior Living Cmtys., Inc., 666 F.3d 1269, 1271 (11th Cir. 2012). Plaintiff brings claims for both interference and retaliation.

### 1. Interference

The FMLA prohibits an employer from interfering with, restraining, or denying the exercise of any right provided under the FMLA. 29 U.S.C. § 2615(a)(1). "A plaintiff claiming interference must demonstrate by a preponderance of the evidence that [he] was denied a benefit to which [he] was entitled." Pereda, 666 F.3d at 1274 (internal quotation marks omitted). "[T]he employer's motives are irrelevant." Strickland v. Water Works & Sewer Bd. of the City of Birmingham, 239 F.3d 1199, 1208 (11th Cir. 2001). The employee need only prove that he was entitled to a benefit and that the employer interfered with that benefit.

There is no evidence here from which a reasonable jury could conclude that Defendant interfered with Plaintiff's FMLA rights. The undisputed evidence is that Plaintiff applied for and was granted intermittent FMLA leave so that he could help care for his father, who was undergoing treatment for pancreatic cancer. (DSOMF ¶¶ 11-15). Plaintiff formally utilized the leave afforded him on at least one occasion. (Id. at ¶ 18). Defendant additionally informally allowed Plaintiff to take days off or to leave work early to care for his father. (Id. at ¶ 20). And, on May 20, 2019, Plaintiff's last date of employment, Defendant did not interfere with Plaintiff's request to leave his shift early to take his father to the emergency room. (Id. at ¶ 23). "[A] plaintiff suffers no FMLA injury when [he]

17

receives all the leave [he] requests." <u>Graham v. State Farm Mut. Ins. Co.</u>, 193 F.3d 1274, 1274 (11th Cir. 1999). Defendant, therefore, is entitled to summary judgment on Plaintiff's FMLA interference claim.

## 2.    Retaliation

Plaintiff also argues that his termination constitutes FMLA retaliation. To succeed on a claim of FMLA retaliation, an employee must demonstrate that his employer intentionally discriminated against him for exercising his rights under the FMLA. <u>Jones v. Gulf Coast Health Care of Del., LLC</u>, 854 F.3d 1261, 1270 (11th Cir. 2017). In the absence of direct evidence of an employer's intent, courts evaluating FMLA retaliation claims employ the <u>McDonnell-Douglas</u> burden-shifting framework. <u>See</u> <u>id.</u> at 1271. To establish a prima facie case of retaliation under that framework, the employee must establish that "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." <u>Walker v. Elmore Cnty. Bd. of Educ.</u>, 379 F.3d 1249, 1252 (11th Cir. 2004). Once an employee makes out a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the discharge. <u>Id.</u> If the employer meets this burden, the burden then shifts back to the employee to demonstrate that the proffered reason is pretext for discrimination. <u>Id.</u>

Here, even assuming that Plaintiff could establish a prima facie case for FMLA retaliation, no reasonable factfinder could find that Defendant's legitimate, non-retaliatory reason for terminating Plaintiff is merely pretext for discrimination. As discussed above, the evidence shows that Defendant terminated Plaintiff for repeatedly failing to complete his work assignments and not, as Plaintiff suggests, because Defendant was "tired of Plaintiff taking time off to care for his invalid father." (Doc. 15, p. 11). No mention was made of Plaintiff's early departure on May 30, 2019, during his June 3, 2019 exit interview. (DSOMF ¶ 28). Rather, the focus was on Plaintiff's insubordination for failing to finish any portion of his work assignment during the time he worked that day. (Id.). Plaintiff has otherwise failed to point to any evidence from which a jury could conclude that his lack of productivity was not the legitimate basis for his termination. Accordingly, Defendant is entitled to summary judgment on Plaintiff's FMLA retaliation claim.

## IV. CONCLUSION

For the reasons discussed herein, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 13).

**SO ORDERED**, this the 15th day of July, 2021.


_s/ Hugh Lawson_____
**HUGH LAWSON, SENIOR JUDGE**

aks